## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

ANDREAS PRIDDY, )
)
        Plaintiff, )
)
        v. )    No. 4:19-CV-945 RLW
)
ANDREW SAUL, )
Commissioner of Social Security, )
)
        Defendant. )

## MEMORANDUM AND ORDER

Plaintiff Andreas Priddy brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the Commissioner's final decision denying his applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. For the reasons that follow, the decision of the Commissioner is reversed and remanded.

### I. Procedural History

Andreas Priddy applied for Disability Insurance Benefits on December 22, 2015. (Tr. at 371-372). He also filed an application for Supplemental Security Income Benefits on January 15, 2016. (Tr. at 377-382). Both applications were denied initially on February 24, 2016. (Tr. at 238-248). Plaintiff filed a Request for Hearing on March 23, 2016, and the hearing was held on July 13, 2018. (Tr. at 34-66; 249-253). The ALJ subsequently issued an unfavorable decision on September 17, 2018. (Tr. at 7-28). Because he did not agree with this decision, Plaintiff filed a Request for Review of Hearing Decision with the Appeals Council on October 24, 2018, which was denied on March 8, 2019. (Tr. at 1-6; 368-370). Plaintiff has exhausted all administrative remedies.

In this action for judicial review, Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff argues that the ALJ's finding that Plaintiff has the residual functional capacity (RFC) to perform a wide range of light work is not supported substantial evidence in the record. Plaintiff argues that the ALJ did not develop the record as to Plaintiff's limitations or properly weigh Plaintiff's testimony. Plaintiff requests that the decision of the Commissioner be reversed, and that the matter be remanded for an award of benefits or for further evaluation.

## II.  Evidence Before the ALJ

### A.    Medical Evidence

On February 15, 2013, Plaintiff presented to Advanced Pain Center for treatment of pain in his back, legs, and knees. (Tr. at 620). He reported experiencing joint pain and stiffness. (Tr. at 619). He was prescribed Endocet. (Tr. at 620). Plaintiff returned on March 27, 2013, with continued back pain. (Tr. at 615). Upon physical examination, the doctor found moderate tenderness along the lumbar spine. (Tr. at 616). His prescription of Endocet was continued. (Tr. at 617). On April 24, 2013, Plaintiff underwent a lumbar epidural steroid injection. (Tr. at 614). He experienced more than 80% relief from a previous injection. (Tr. at 614).

Plaintiff presented to Patrick Oruwari, M.D. on April 30, 2013, for treatment of depression. (Tr. at 510). He presented with a depressed mood but reported he had been doing okay. (Tr. at 510). Dr. Oruwari continued Plaintiff's medications. (Tr. at 513). Plaintiff returned for a follow-up on August 22, 2013, and reported doing fine. (Tr. at 506). He exhibited an anxious mood. (Tr. at 507). His medications were continued. (Tr. at 508).

On September 16, 2013, Plaintiff returned to Advanced Pain Center and reported being recently diagnosed with a bone spur of the left foot. (Tr. at 600). He reported using memory foam inserts to help with the pain. (Tr. at 600). Further, he reported continued joint pain, joint stiffness,

2

and muscle cramps. (Tr. at 601). Tenderness was noted along his lumbar spine. (Tr. at 602). He reported no change in his symptoms during an October 23, 2013 visit. (Tr. at 596).

Imaging of the lumbar spine on October 7, 2013, revealed mild lumbar spondylosis and right sacroiliac osteoarthritis. (Tr. at 581). An MRI that same month revealed minimal to mild degenerative changes. (Tr. at 580).

Plaintiff returned to Dr. Oruwari on November 18, 2013, for a follow-up. (Tr. at 502). He reported his mood was up and down, but usually okay. (Tr. at 502). He reported some difficulty with sleep. (Tr. at 502). Plaintiff exhibited a euthymic mood with an appropriate affect, and his medications were continued. (Tr. at 503-504).

Plaintiff returned to Advanced Pain Center on November 20, 2013, for a follow-up of chronic back pain. (Tr. at 592). Upon physical examination, tenderness was found along the lumbar spine and sacroiliac joint. (Tr. at 594). He reported no improvement in his symptoms during a December 18, 2013 visit. (Tr. at 588). On January 15, 2014, Plaintiff displayed bilateral knee tenderness to the patella with some crepitus. (Tr. at 586).

On July 21, 2014, Plaintiff returned to Dr. Oruwari. (Tr. at 495). He reported improvement of his initial symptoms and reported doing well on his medications. (Tr. at 495). Plaintiff continued to report doing fine on October 27, 2014. (Tr. at 490). On February 28, 2015, Plaintiff explained he was feeling depressed over his disability application. (Tr. at 498). He exhibited a depressed mood during the session. (Tr. at 499). When Plaintiff returned to Dr. Oruwari on October 12, 2015, he reported that his memory had gotten progressively worse and he was having a hard time concentrating and compulsive feelings of self-harm. (Tr. at 482). Plaintiff exhibited a depressed mood and constricted affect. (Tr. at 485). Dr. Oruwari diagnosed bipolar disorder, current episode depressed, mild, and generalized anxiety disorder, asymptomatic. (Tr. at 486).

Plaintiff presented to Bonne Terre, LLC on November 12, 2015, and reported suffering from a migraine. (Tr. at 834). He reported feeling nauseated and was unable to take his medications for the past few days as a result. (Tr. at 834).

On January 11, 2016, Plaintiff returned to Dr. Oruwari and reported feeling severely depressed and said he had recently felt suicidal and felt the need to harm himself. (Tr. at 476). During the session, Plaintiff exhibited a euthymic mood with a constricted affect. (Tr. at 480).

Plaintiff returned to his primary care physician at Bonne Terre, LLC on February 12, 2016, and reported experiencing right shoulder pain. (Tr. at 832). Plaintiff was advised that he had inflammation of the supraspinatus tendon. (Tr. at 832). A subsequent MRI of the right shoulder performed on February 23, 2016, revealed distal supraspinatus insertional tendinitis without rotator cuff tear and mild effusion without loose body. (Tr. at 862).

Plaintiff presented to Mercy Clinic for a neurology consult on May 9, 2016. (Tr. at 868). He reported having twelve days with a headache over the past month. (Tr. at 868). He described the headaches as severe and stabbing pain with associated nausea, vomiting, dizziness, photophobia, and distorted vision. (Tr. at 868). He reported intermittent benefit from his medications. (Tr. at 868). Dr. Alam started Plaintiff on Verapamil. (Tr. at 872).

On May 12, 2016, Plaintiff returned to his primary care physician and reported continued low back pain with radiation to the left hip and knees. (Tr. at 829). He explained that his back pain was an 8-9/10 at times. (Tr. at 829). Examination revealed tenderness, and Dr. Ninichuck refilled Plaintiff's prescriptions of Norco and MS Contin. (Tr. at 830-31).

Imaging of the lumbar spine performed on May 13, 2016, revealed minimal diffuse spondylosis and lower lumbar facet arthropathy. (Tr. at 555).

Plaintiff reported increased bilateral shoulder pain on August 12, 2016. (Tr. at 826). His dose of MS Contin was increased. (Tr. at 828). However, on August 17, 2016, Plaintiff reported

4

having increased back pain and having to take all of his breakthrough medications around the clock. (Tr. at 836). Dr. Ninichuck increased Plaintiff's dosage of MS Contin. (Tr. at 836-37).

On October 31, 2016, Plaintiff reported aggravating his lower back and requested a stronger pain medication. (Tr. at 822). His dose of Robaxin was increased. (Tr. at 822).

Plaintiff reported to Carbondale Memorial Hospital on December 17, 2016, for a severe migraine. (Tr. at 651). He explained that his migraine had not been relieved by morphine or hydrocodone. (Tr. at 651). Plaintiff was given an injection and discharged home. (Tr. at 657).

On February 9, 2017, Plaintiff presented to Dr. Alam for continued evaluation of his headaches. (Tr. at 893). He reported having a constant headache since mid-December. (Tr. at 893). Dr. Alam believed Plaintiff's headaches to be rebound headaches and instructed him to restart Verapamil. (Tr. at 897).

Plaintiff returned to Dr. Ninichuck on February 14, 2017, and reported having difficulty keeping his medications down due to nausea from headaches. (Tr. at 813). Dr. Ninichuck recommended increasing Plaintiff's prescription of Verapamil and referred Plaintiff to Dr. Maynard for evaluation of his shoulder pain. (Tr. at 815-16).

On February 28, 2017, Plaintiff reported to Dr. Oruwari that he had been experiencing bad mood swings and had been mostly down and depressed. (Tr. at 642). He also reported having difficulty sleeping and was prescribed Zolpidem. (Tr. at 643).

Lumbar spine imaging performed on February 28, 2017, revealed mild degenerative disc disease and degenerative joint disease. (Tr. at 532). An MRI of the lumbar spine performed on May 5, 2017, revealed mild to moderate degenerative disc disease with eccentric disc extrusion at L5-S1 and neural foraminal narrowing in the lower lumbar spine. (Tr. at 534-535).

Plaintiff returned to Dr. Oruwari on May 26, 2017, and reported having a headache all day. (Tr. at 636).  He also reported being manic lately, riding too fast,[1] having racing thoughts, and high energy. (Tr. at 636). He appeared unkempt, was irritable, and had constricted affect. (Tr. at 640). Dr. Oruwari renewed his medications. (Tr. at 637).

Thoracic spine imaging performed on June 22, 2017, revealed degenerative disc disease of the lower thoracic spine. (Tr. at 533). Imaging of the cervical spine performed on November 2, 2017, revealed degenerative changes. (Tr. at 796).

On December 11, 2017, Plaintiff reported to Dr. Ninichuck that he had not experienced any improvement in his back and neck pain and his left knee pain was becoming increasingly worse. (Tr. at 800). Subsequent imaging revealed mild multilevel degenerative changes and multiple levels of foraminal narrowing of the cervical spine. (Tr. at 957). An MRI of the lumbar spine revealed diffuse disc bulging and bilateral foraminal narrowing. (Tr. at 959). And imaging of the left knee performed on February 4, 2018, revealed small knee joint effusion associated with minimal osteoarthritis involving the medial femoral compartment. (Tr. at 956).

On February 7, 2018, Plaintiff reported to Cape Midwest Neurosurgeons for evaluation of low back pain. (Tr. at 977). He reported a new onset of pain, but also noted that he had been seen by Advanced Pain Center where he underwent epidural steroid injections. (Tr. at 977). Examination revealed decreased motor strength on the right and positive straight leg testing on the right. Dr. Fonn reviewed imaging done before the appointment and noted worsening at the L5/S1 level, worsening of the disc herniations, and worsening of the condition at L5/S1. (Tr. at 978). Dr. Fonn diagnosed lumbar radiculopathy, lumbar stenosis with neurogenic claudication, lumbago, and sciatica. He recommended additional imaging. (Tr. at 979). When Plaintiff returned

---

[1]The notation "riding too fast" is ambiguous, and it is unclear from the record as to what activity the notation refers.  See discussion infra.

on March 7, 2018, he reported continued low back pain with radiation to his legs as well as numbness and burning in his right foot. (Tr. at 971). A nerve conduction study of the lower extremities revealed left tarsal tunnel, right peroneal neuropathy, and right L5/S1 radiculopathy. Several abnormalities were found on GSR suggesting the presence of a small fiber neuropathy as well. (Tr. at 971). Dr. Fonn recommended a lumbar facet block. (Tr. at 973). An MRI that same day revealed paracentral disc herniation to the right side which extended into the foraminal area at L5-S1 and facet hypertrophy at L5-S1 and L4-L5. (Tr. at 975).

On March 12, 2018, Plaintiff underwent a left facet block procedure. (Tr. at 965). On March 21, 2018, he reported no relief of his symptoms despite the procedure. (Tr. at 967). He continued to report low back pain with radiation to his extremities. (Tr. at 967). Dr. Fonn recommended an epidural steroid injection. (Tr. at 969).

Plaintiff underwent a right epidural steroid injection on April 2, 2018. (Tr. at 966). He reported some improvement in pain after the injection on April 5, 2018. (Tr. at 990). But, after Dr. Ninichuck attempted to decrease his medications on May 23, 2018, Plaintiff reported increased pain. Because Dr. Fonn no longer accepted Medicaid, Plaintiff requested a referral to another neurosurgeon. (Tr. at 987).

### B.    Testimony at Administrative Hearing

Plaintiff appeared and testified at a hearing held on July 13, 2018, before Administrative Law Judge Gerald Meyr. Plaintiff testified to last working in March 2007 as an over-the-road driver. (Tr. at 42). He testified to stopping work after he was in two motor vehicle accidents within a month. (Tr. at 44). Plaintiff explained that he was unable to return to work due to injuries and stress. (Tr. at 44). Plaintiff testified that the main reason he was unable to work was his constant pain, migraines, and difficulty concentrating and remembering. (Tr. at 45).

7

As for his physical pain, Plaintiff testified to having osteoarthritis in most joints, degenerative disc disease, as well as a collapsed disc and another that was bulging. (Tr. at 45). He testified that he experienced the most pain in his lower back, neck, knees, and hands. (Tr. at 45). Plaintiff explained that his back pain was constant and was worsened with activity. (Tr. at 46). Plaintiff testified to only being able to stand in one place for ten minutes and that he could only walk the distance around a football field, but it would be with some difficulty. (Tr. at 48). Walking caused pain in his knees, he testified. (Tr. at 50). Plaintiff further explained that he had constant pain in his neck and that he would only get four to six hours of sleep a night due to the pain. (Tr. at 49). Plaintiff testified to taking MS Contin and Norco for pain management. (Tr. at 53).

As to his migraines, Plaintiff testified that they had gotten worse and more frequent since his accident in 2007. (Tr. at 50). He testified to having a constant low-grade migraine since December 2016 and full-blown migraines three to five days a week. (Tr. at 51). Plaintiff testified to experiencing pain in his eyes, head, neck, nausea, and vomiting during a migraine. (Tr. at 51). He testified that he was unable to take medication for migraines because it interfered with his other medications. (Tr. at 52).

Concerning his activities of daily living, Plaintiff testified to waking up and sitting in his recliner for a while before helping his wife feed their cats and horses. (Tr. at 56).  He testified that he does no lifting when he feeds the horses and cats. He testified that his wife does the hay, and he feeds the horses with a coffee can half-full of grain.  He testified to trying to help with housework when he could, but he had to take a lot of breaks while doing so. (Tr. at 57).  When doing dishes, he testified that he would do a bit, sit and rest, and do a little more.  (Tr. 57).  He testified that he would have to stop and rest a couple of times when vacuuming a 14 by 25-foot room.  (Tr. 57).  When shopping, he can only walk around the Walmart store once, and he leans

8

on the cart.  (Tr. 48, 58).  When bringing in the groceries, he takes several trips with his wife, and he needs to rest afterward.  He testified that he drives some but needs to take frequent breaks due to the pain in his back.  (Tr. 41).

Vocational Expert (VE), Lisa Cox, also testified at the hearing.  The ALJ gave the VE a hypothetical.  He asked the VE if there is work in the economy for an individual with the same age, education, and work background as Plaintiff, who is able to perform light work with the following restrictions: the individual is able to occasionally push and pull with the bilateral upper extremities but only occasionally use foot controls with the bilateral lower extremities; the individual would be able to occasionally climb ramps and stairs but never be able to climb ladders, ropes and scaffolds; the individual would be able to occasionally balance, stoop and crouch, but never kneel or crawl; the individual would be able to bilaterally handle objects that is gross manipulation frequently with the upper extremities and would be able to bilaterally finger objects that is fine manipulation of items no smaller than the size of a paperclip frequently with the upper extremities; the individual would be able to frequently feel bilaterally with the upper extremities; the individual can only occasionally tilt his head; the individual must avoid all exposure to unshielded moving mechanical parts, avoid all exposure to unprotected heights and have no use of hazardous machinery; should have no driving of motor vehicles as part of the work function, is able to remember, understand, and carry out simple and routine instructions and tasks consistent with SVP levels 1 and 2 type jobs; the individual can have no interaction with the general public and only occasional interaction with co-workers and supervisors after the first 30 days of employment.  (Tr. 62-3).  The VE answered that such an individual could perform work as a small products assembler (DOT 706.684-022), merchandise marker (DOT 209.587-034), or bakery worker (DOT 524.687-022). (Tr. 63).

### III. The ALJ's Decision

The ALJ issued an unfavorable decision on September 17, 2018, in which he determined that Plaintiff had not engaged in substantial gainful activity since his onset date and that he suffered from severe impairments of depression, bipolar disorder, anxiety disorder, osteoarthritis, degenerative joint disease, disorder of the cervical, thoracic and lumbar spine, chronic pain, headaches, spinal bifida occulta, migraines, and major dysfunction of the left knee and right shoulder. (Tr. at 12).  The ALJ found these conditions did not meet or equal a listed impairment.

In making his RFC determination, the ALJ summarized Plaintiff's medical records, including treatment notes, testing, and imagining results.  He did not, however, rely on an opinion from a medical source.[2]

The ALJ relied on the following medical evidence regarding Plaintiff's back: the fact that Plaintiff received steroid injections in 2013, which reduced his pain by more than 80 percent, (Tr. 16, 611, 614, 617); a lumbar MRI from October 2013, which showed minimal to mild degenerative changes and imaging from October 2013 that showed mild lumbar spondylosis and right sacroiliac osteoarthritis, (Tr. 16, 581); Plaintiff's reporting of severe pain in December 2013 during an examination that showed moderate tenderness to the lumbar spine, positive straight leg raising, and sacroiliac joint tenderness to palpation, (Tr. 16, 588-91); subsequent imaging of the thoracic spine in March 2014 that showed scattered tiny osteophytes, (Tr. 16, 577); imaging in May 2016 showing minimal diffuse spondylosis and lower lumbar facet arthropathy, (Tr. 16-17, 555, 861); evidence that Plaintiff reported that he had been cleaning in October 2016, which aggravated his

---

[2]In his brief, Plaintiff makes no specific arguments concerning the ALJ's findings with regard to his mental impairments and, therefore, the Court will focus on the exertional and physical aspects of the ALJ's findings.

back, and the fact that he requested stronger medication, (Tr. 17, 820); imaging in February, May, June, and December 2017, showing mild to moderate degenerative changes; imaging in February 2018, showing degenerative changes at L5-S1 with no spondylosis or spondylolisthesis and normal disc spaces, and a nerve conduction study revealing right L5-S1 radiculopathy, (Tr. 981-82); an examination in February 2018, at which Plaintiff had a positive lumbar straight leg test on the right and his motor strength was a little weaker on the right, but he had normal gait and station, normal tone, no atrophy (Tr. 17, 971-73); it was noted Plaintiff had no work restrictions, (Tr. 17, 971-73); and Plaintiff's reports of improvement of his pain and neuropathy in April 2018, after receiving left facet lumbar blocks in February and April 2018.  (Tr. 17, 965-66, 990).

As for Plaintiff's shoulder pain, the ALJ relied on the following medical evidence in making his RFC determination: evidence showing inflammation of the supraspinatus tendon in February 2016, (Tr. 17, 932); an MRI in February 2016 showing tendonitis without rotator cuff tear and mild effusion without loose body, (Tr. 17, 862); and Plaintiff's reports of worsening shoulder pain in August 2016 and February 2017. (Tr. 813 and 826).  The ALJ also noted that while Plaintiff was referred for further workup, "records regarding escalating treatment appear absent from the record."  (Tr. 17).

In considering Plaintiff's complaints of knee pain, the ALJ considered the following medical evidence: an examination in January 2014 showing generalized bilateral knee tenderness with some crepitus, but no swelling, (Tr. 17, 586); imaging performed in February 2014 showing only small knee joint effusion and minimal osteophyte formation, (Tr. 17,  956); a medical visit in December 2017, at which Plaintiff reported worsening left knee pain and examination showed tenderness and positive McMurray's testing, (Tr. 17, 800); and examination records from January and March 2018, which indicated that Plaintiff's gait and station were normal. (Tr. 1013, 1018).

11

The ALJ summarized the medical findings as: "[Plaintiff] has mild to moderate degenerative disc disease in the cervical, thoracic, and lumbar spine, sacroiliac osteoarthritis, and a spina bifida occulata at S1, in addition to major dysfunction of the left knee and right shoulder. While objective evidence revealed moderate degenerative disc disease at most, [ ] treatment for his left knee and shoulder are somewhat limited ... ." (Tr. 18).

For Plaintiff's RFC, the ALJ concluded Plaintiff retained the ability to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), but that he had many additional functional limitations:

> The claimant is able to occasionally push and pull with the bilateral upper extremities but only occasionally use foot controls with the bilateral lower extremities. He would be able to occasionally climb ramps and stairs but never be able to climb ladders, ropes and scaffolds. The claimant may occasionally balance, stoop and crouch, but never kneel or crawl. He would be able to bilaterally handle objects that is gross manipulation frequently with the upper extremities and would be able to bilaterally finger objects that is fine manipulation of items no smaller than the size of a paperclip frequently with the upper extremities. The claimant would be able to frequently feel bilaterally with the upper extremities but can only occasionally reach overhead. He must avoid all exposure to unshielded moving mechanical parts, avoid all exposure to unprotected heights and have no use of hazardous machinery. He may not drive motor vehicles as part of the work function. The claimant is able to remember, understand, and carry out simple and routine instructions and tasks consistent with SVP levels 1 and 2 type jobs with no interaction with the general public and only occasional interaction with co-workers and supervisors after the first 30 days of employment.

(Tr. 15).

The ALJ then relied on vocational expert testimony to conclude that while Plaintiff was unable to perform his past relevant work, he could perform work as a small product assembler, merchandise marker, and bakery worker. (Tr. at 20-21).

## IV. Legal Standard

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Sec'y of Health

& Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.   If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  If claimant's impairment(s) meets or equals one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, a finding of "disabled" is appropriate.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a

preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585–86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."

Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

## V. Discussion

Plaintiff argues the ALJ did not make his RFC determination based on substantial evidence on the record. Specifically, he faults the ALJ for not pointing to some medical evidence to support the conclusion that Plaintiff can perform light work with some modifications. Plaintiff also challenges the ALJ's credibility findings and argues the ALJ did not properly weigh Plaintiff's testimony.

### A.   RFC Determination

The ALJ concluded that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), but he found Plaintiff had numerous additional limitations, many of which were very specific. (Tr. 15). Despite all the additional limitations to light work, the ALJ placed no restrictions on the length of time Plaintiff could stand or walk, or the amount and frequency he could lift objects.[3] Plaintiff challenges this RFC determination, arguing that the ALJ failed to include a narrative discussion describing how the evidence supports the RFC. He argues the RFC is not supported by substantial evidence in the record.

RFC is what a claimant can do despite his limitations and includes an assessment of physical abilities and mental impairments. 20 C.F.R. §§ 404.1545, 416.945. The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis. SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996). "[A]lthough medical

---

[3]Light work involves lifting no more than 20 pounds with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567. To be considered capable of performing light work, a claimant must be able to do "a good deal of walking or standing." Id. The Eighth Circuit recognizes that "'[l]ight work requires that a claimant be capable of standing or walking for a total of six hours out of an eight-hour workday." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995).

source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner," Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, and the claimant's own descriptions of his limitations. Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017); Pearsall, 274 F.3d at 1217. According to the Eighth Circuit, "[u]ltimately, the RFC determination is a 'medical question,' that 'must be supported by some medical evidence of [the claimant's] ability to function in the workplace.'" Noerper v. Saul, 964 F.3d 738, 744 (8th Cir. 2020) (quoting Combs, 878 F.3d at 646; see also Steed v. Astrue, 524 F.3d 872, 875 (8th Cir. 2008) (ALJ's RFC assessment must be supported by medical evidence). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (some medical evidence must support the determination of the claimant's RFC). An ALJ's RFC determination should be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

It is the claimant's burden to establish his RFC. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). However, the ALJ has an independent duty to develop the record, despite the claimant's burden. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). "[T]he ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)). "The ALJ must neutrally develop the facts." Stormo, 377 F.3d at 806. In some cases, the duty to develop the record requires the ALJ to obtain additional medical evidence, such as a consultative examination of the claimant, before rendering a decision. See 20 C.F.R. §§ 404.1519a(b), 416.945a(b).

In his written decision, the ALJ summarized the medical evidence, but he did not base his finding on medical opinions or adequately explain the reasoning behind his RFC determination. After reviewing the record as a whole, the Court does not find any medical evidence that supports the ALJ's finding that Plaintiff can lift 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, or that he is capable of standing or walking for a total of six hours out of an eight-hour workday.  20 C.F.R. § 404.1567; Frankl, 47 F.3d at 937.  The record contains no medical opinion evidence that addresses Plaintiff's physical ability to function in the workplace, or treatment notes or objective findings about Plaintiff's functional abilities.

In making his RFC determination, the ALJ discussed Plaintiff's reports of pain and the results from imagining showing mild to moderate changes in his spine, but there was no discussion of Plaintiff's functional ability.  The ALJ noted that in February 2018, Plaintiff's "motor strength was a little weaker on the right," that he "had a normal gait and station with normal tone and no atrophy," and he had "a positive lumbar straight test on the right." (Tr. 17).  There is no indication in the records, however, how these observations made during a medical examination relate to Plaintiff's functional ability in the workplace.  The Eighth Circuit has warned that "an ALJ must not substitute his opinions for those of the physician." Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008) (citing Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990)); see also Pate-Fires v. Astrue, 564 F.3d 935, 946–47 (8th Cir. 2009) (noting that ALJs may not "play doctor").  An ALJ is not permitted to "draw his own inferences about [a] plaintiff's functional ability from medical reports," Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004).

Here, like the ALJ in Combs v. Berryhill, the ALJ erred by relying on his own inferences as to the relevance of medical notations such as "normal gait and station" and "normal tone and no atrophy" when determining Plaintiff's ability to function in the workplace.  878 F.3d at 647. Not unlike the record in Combs, Plaintiff's medical providers wrote in their treatment notes that

17

some of Plaintiff's findings were normal, such as his gait and tone and the fact there was no evidence of atrophy, but they likewise consistently diagnosed him with degenerative disc disease, a herniated disc, osteoarthritis, as well as other conditions such as migraines, and prescribed pain medications, including heavy narcotics.  Plaintiff underwent a number of treatments over the years including epidural steroid injections, facet block procedures, a TENS unit, and the use of narcotic medications, which is consistent with Plaintiff's claims of significant impairment.  O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003) (use of narcotic medications and numerous attempts to find pain relief supportive of claimant's claims of impairment).  By relying on his own interpretation of what "normal gait and station" and "normal tone and no atrophy" meant in terms of Plaintiff's RFC, without medical evidence as Plaintiff's functional ability, "the ALJ failed to satisfy his duty to fully and fairly develop the record." Id.; see also Byes v. Astrue, 687 F.3d 913, 915–16 (8th Cir. 2012) ("Failing to develop the record is reversible error when it does not contain enough evidence to determine the impact of a claimant's impairment on his ability to work."); but see Cox v. Astrue, 495 F.3d 614, 620 n.6 (8th Cir. 2007) (ALJ need not obtain an RFC assessment from a physician, or other provider, where the record contains medical "evaluations [that] describe [the plaintiff's] functional limitations with sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment.).

In assessing Plaintiff's RFC, the ALJ also pointed out that Plaintiff's treating physician, Donjay Joseph Fonn, D.O., a neurosurgeon, reported that Plaintiff had no current work restrictions. (Tr. 969, 973, 979).  It is unclear from the records, however, what this notation means and upon what criteria, if any, it was based.

In 2018, Plaintiff was seen my Dr. Fonn on February 7, March 7, March 12, and March 21, complaining of severe back pain.  Based on previous imaging, Dr. Fonn diagnosed Plaintiff with lumbar radiculopathy, lumbar stenosis with neurogenic claudication, lumbago, and sciatica.  A

18

nerve conduction study of the lower extremities revealed left tarsal tunnel, right peroneal neuropathy, and right L5/S1 radiculopathy. Several abnormalities were found on GSR suggesting the presence of a small fiber neuropathy as well. (Tr. at 971). Further imagining revealed paracentral disc herniation to the right side, which extended into the foraminal area at L5-S1 and facet hypertrophy at L5-S1 and L4-L5. (Tr. at 975).  Dr. Fonn noted Plaintiff was being treated with MS-Cotin and Norco, narcotic pain medications.  (Tr. 977).  Plaintiff was also being prescribed propranolol. (Tr. 969).  On March 12, 2018, Dr. Fonn performed facet block procedure, (Tr. at 965), but on March 21, 2018, Plaintiff reported no relief of his symptoms despite the procedure. (Tr. at 967). He continued to report low back pain with radiation to his extremities. (Tr. at 967). Dr. Fonn recommended an epidural steroid injection, which Plaintiff underwent on April 2, 2018.  (Tr. at 966, 969).

A finding of "<u>no</u> current work restrictions" is inconsistent with these treatment notes, (Tr. 969, 973, 979) (emphasis added), and it is certainly not conclusive as to Plaintiff's RFC. <u>Ellis</u>, 392 F.3d at 994 ("A medical source opinion that an applicant is 'disabled' or 'unable to work,'... is not the type of 'medical opinion' to which the Commissioner gives controlling weight.").  The Court finds that the notation "no current work restrictions" was a crucial issue that went undeveloped, and the ALJ should have clarified the meaning of this notation instead of relying on it, at least in part, for his RFC determination.  <u>Vossen v. Astrue</u>, 612 F.3d 1011, 1016 (8th Cir. 2010) (an ALJ does not "have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.") (citing <u>Stormo</u>, 377 F.3d at 806); <u>see also Ellis</u>, 392 F.3d at 994 (duty to seek clarification from treating physician "arises only if a crucial issue is undeveloped").

Furthermore, the ALJ cited to no opinion evidence whatsoever – treating, consulting or otherwise – in support of his RFC determination.  The Court recognizes that the absence of

medical opinion evidence does not necessarily require remand. Under certain circumstances, mild or unremarkable objective medical findings may constitute sufficient medical evidence for an RFC finding, "even in the absence of any medical opinion evidence directly addressing the Plaintiff's ability to function in the workplace." Snider v. Colvin, No. 4:15-CV-641-SPM, 2016 WL 5076188, at *5 (E.D. Mo. Sept. 20, 2016); see also Steed, 524 F.3d at 875–876 (upholding the ALJ's finding that the plaintiff could perform light work based on largely mild or normal objective findings regarding her back condition, despite the fact that the medical evidence was " 'silent' with regard to work-related restrictions such as the length of time she [could] sit, stand and walk and the amount of weight she can carry"); Thornhill v. Colvin, No. 4:12-CV-1150 CEJ, 2013 WL 3835830, at *12 (E.D. Mo. July 24, 2013) (holding that medical records supporting the ALJ's statement that "physical examinations have been essentially unremarkable and reveal normal independent gait with no evidence of spine or joint abnormality or range of motion limitation or muscle tenderness" constituted medical evidence in support of a finding that the claimant could perform medium work).

Here the record does not contain generally mild or unremarkable objective findings or other medical evidence that tends to support the ALJ's RFC determination. Rather the medical records seem to support Plaintiff's assertion that he has chronic pain that significantly impacts his ability to stand and walk for significant periods of time or lifting more than five or ten pounds. (Tr. 46-9). Throughout the medical records, Plaintiff consistently reported moderate to severe back pain, aggravated by physical activity, even while taking his medication. Plaintiff's treatment providers frequently noted physical examination findings of tenderness in the lumbar spine and a positive straight leg raising test. Imaging and nerve conduction studies showed degenerative disc disease, lumbar radiculopathy, paracentral disc herniation, lumbar stenosis with neurogenic claudication, lumbago, left tarsal tunnel, peroneal neuropathy, and sciatica. Plaintiff's treatment for his back

20

has not been limited. He has undergone numerous treatments in an attempt to find relief, including epidural steroid injections, facet block procedures, a TENS unit, and the use of narcotic medications.

The ALJ's discussion of Plaintiff's RFC does not make it clear how the medical evidence or supports the ALJ's RFC determination. The medical records are mixed, and include positive and negative examination findings, but as acknowledged by the Commissioner, the trend in the medical records is a worsening of Plaintiff's condition. The ALJ did not explain how the medical findings in the record relate to Plaintiff's ability to walk, stand, lift, or perform other work-related activities, and it is not apparent to the Court how they do. The record does not support the ALJ's conclusion that Plaintiff had moderate degenerative disc disease "at most," (Tr. 18), and given the absence of opinion evidence, it is unclear how the objective finding of "moderate disc disease," or any of the ALJ's other findings, relate to Plaintiff's functional abilities in the workplace.

In sum, the Court finds that that record is underdeveloped in that there is no medical evidence addressing how the claimant's physical impairments impact his ability to work. The ALJ's RFC assessment was not supported by "some medical evidence" in the record that addressed his ability to function in the workplace and, therefore, this case must be reversed and remanded for further consideration. See Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (holding ALJ's RFC assessment was not properly informed and supported by some medical evidence in the record).

### B.     *Credibility Determination*

Plaintiff also challenges the ALJ credibility determination regarding Plaintiff's subject complaints of pain. Plaintiff argues the ALJ did not properly weigh his testimony.

21

"[T]he underlying determination as to the severity of impairments is not based exclusively on medical evidence or subjective complaints. Rather, regulations set forth assorted categories of evidence that may help shed light on the intensity, persistence, and limiting effects of symptoms. Similar factors guide the analysis of whether a claimant's subjective complaints are consistent with the medical evidence." Noerper, 964 F.3d at 744 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (listing factors such as: "the claimant's daily activities," "the duration, frequency and intensity of the pain," "precipitating and aggravating factors," "dosage, effectiveness and side effects of medication," and "functional restrictions"). When discounting a claimant's statements, an ALJ must provide specific reasons for doing so. Delrosa v. Sullivan, 922 F.2d 480, 485 (8th Cir. 1991). Credibility findings must be explicit. Dipple v. Astrue, 601 F.3d 833, 837 (8th Cir. 2010); see also Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) ("an ALJ must explicitly discredit a claimant and give reasons . . . he must consider the factors set out in Polanski.").

ALJ noted in his decision that "[t]reatment notes in the record somewhat support the claimant's allegations of disabling physical limitations. However, the persuasive value of the claimant's allegations [is] unsupported by evidence of reduced daily activities and consistencies between the medical evidence and his allegations and activities." (Tr. 20). The ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effect of [Plaintiff's] symptoms are not entirely consistent with the medical evidence and other evidence on the record … ." (Tr. 16). The ALJ noted that Plaintiff had reported very limited activities, however, he reported that he could drive, shop for an hour, owns a motorcycle, and "reported in May 2017 that he was riding too fast, which is somewhat inconsistent with his reported back, shoulder and knee pain." (Tr. 18).

At the hearing, Plaintiff testified that he had significant limitations on his daily activities arising from his conditions. He testified that he drives some, but he needs to take frequent breaks

due to the pain in his back.  (Tr. 41).  The day of the hearing he drove "a little over an hour" and

stopped once."  (Tr. 41).  Plaintiff testified that he helps around the house when he can, but that he

must take frequent breaks.  For example, when doing dishes, he would do a bit, sit and rest, and

do a little more.  (Tr. 57).  He testified that he would have to stop and rest a couple of times when

vacuuming a 14 by 25-foot room.  (Tr. 57).  When shopping, he can only walk around the Walmart

store once, and he leans on the cart.  (Tr. 48, 58).  When bringing in the groceries, he takes several

trips with his wife, and he needs to rest afterward.  This testimony is not inconsistent with

Plaintiff's reported back, shoulder, and knee pain.  Reed v. Barnhart, 399 F.3d 917, 24 (8th Cir.

2005) ("this court has repeatedly observed that the ability to do activities such as light housework

and visiting with friends provides little or no support for the findings that a claimant can perform

full-time competitive work.").

As for Plaintiff owning and riding a motorcycle, there was a reference in treatment notes

dated April 30, 2013, that Plaintiff had no means of transportation except his motorcycle.  (Tr.

510).  And on May 26, 2017, in treatment notes for "medical management with psychotherapy,"

it was noted that Plaintiff had been up since 3:00 a.m. having a headache all day, that Plaintiff had

been "manic lately, riding too fast, racing thoughts, high energy . . . . [H]e is usually more rapid

cycling, but now seems to be manic."  (Tr. 636).  The ALJ cited to this medical record as evidence

Plaintiff was riding a motorcycle during the period he was claiming disability.  The notation "riding

too fast," however, is ambiguous, and it is unclear from the record as to what activity the notation

refers, especially when it was written as part of a description describing increased signs of mania

in Plaintiff's behaviors, and there are other descriptions of "racing thoughts" and  "rapid cycling."

(Tr. 636).   The passing reference to Plaintiff riding a motorcycle in 2013, and a notation that

Plaintiff was "riding too fast," without more, is not substantial evidence that is  inconsistent with

Plaintiff's reported back, shoulder, and knee pain, or even his migraine headaches.

23

## VI.    Conclusion

For the reasons set forth above, the Court finds the ALJ's RFC determination that Plaintiff can perform light work with several restrictions is not supported by substantial evidence in the record.    Therefore, the Court reverses and remands this matter to the Commissioner for further consideration consistent with this Memorandum and Order.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate judgment will accompany this Memorandum and Order.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

Dated this 30th day of November, 2020.